UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>against<br><br>ERNEST MURPHY,<br><br>        Defendant. | No. 18-cr-373-11 (RJS)<br>ORDER |

RICHARD J. SULLIVAN, Circuit Judge:

  Defendant Ernest Murphy moves to dismiss the indictment against him, on the grounds that the government deliberately presented misleading information to the grand jury. He also moves for a new trial under Rule 33 of the Federal Rules of Criminal Procedure, claiming that the government failed to timely produce exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, Murphy's motion is DENIED.

### I.  BACKGROUND

  On May 24, 2018, a grand jury returned an indictment charging fifteen individuals – including Murphy – with conspiracy to distribute 280 grams or more of crack cocaine and 100 grams or more of heroin between 2015 and 2018, in violation of 21 U.S.C. § 841(b)(1)(A), (B) (the "Indictment"). The Indictment also charged seven of the fifteen defendants – but not Murphy – with possession of firearms in furtherance of the narcotics conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i). On April 4, 2019, a grand jury returned a superseding indictment, expanding the period of the conspiracy to between 2011 and 2018. On July 11, 2019, Murphy was named in another superseding indictment (the "S3 Indictment"), which charged him with conspiracy to distribute 280 grams or more of crack cocaine and a quantity of heroin, in violation

of 21 U.S.C §§ 846 and 841(b)(1)(A) and (b)(1)(C) ("Count One"), and with using and possessing firearms in furtherance of the narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 ("Count Two").

Prior to trial, the Court precluded the government from introducing evidence relating to shootings committed by various coconspirators in 2008 and 2018, as well as Murphy's alleged involvement in a 2013 shooting (the "2013 Shooting"). (Doc. No. 414.) The Court also precluded the government from offering certain video recordings that the government produced for the first time just four days before trial. (Doc. No. 435.) After all of Murphy's coconspirators pleaded guilty, trial against Murphy commenced on August 12, 2019. At trial, the government introduced numerous recordings of conversations between Murphy and his coconspirators taken from court-authorized wiretaps, as well as testimony from various law enforcement officers and from Maurice Curtis – one of Murphy's coconspirators, who testified pursuant to a cooperation agreement with the government. On August 20, 2019, the jury convicted Murphy on both counts of the S3 Indictment. (Doc. No. 450.) The Court subsequently sentenced Murphy to an aggregate sentence of 260 months' imprisonment, to be followed by five years' supervised release. (Doc. No. 621.) Murphy appealed the sentence and judgment, which the Second Circuit affirmed on August 27, 2021. *See United States v. Murphy*, No. 20-622, 2021 WL 3826571 (2d Cir. Aug. 27, 2021). (Doc. No. 894.)

On June 24, 2021, while Murphy's appeal was pending before the Second Circuit, the government produced a video that included statements made by Tyquan Robinson – Murphy's coconspirator – during his post-arrest interrogation on January 5, 2018 (the "2018 Robinson Recording"). The government later produced other materials that were not disclosed to Murphy before trial, including a recording of Robinson's post-arrest interrogation in connection with a

2015 shooting (the "2015 Robinson Recording"); recordings of the post-arrest statements of coconspirators Tyshawn Burgess and Kerry Felix in connection with a 2017 shooting (the "2017 Burgess Recording" and "2017 Felix Recording," respectively); and certain materials related to the 2013 Shooting that were shown to the grand jury in connection with the S3 Indictment. Because these recordings (collectively, the "Coconspirator Recordings") and the grand-jury proceedings are central to Murphy's motion, the Court summarizes them below.

### A. The 2015 Robinson Recording

Curtis testified at trial that, during the course of the conspiracy, Robinson admitted that he fired multiple shots at a rival drug dealer named "Shaq" during an altercation in 2015. (Trial Tr. 190.) In the 2015 Robinson Recording, Robinson acknowledged to law enforcement officers that he was involved in the altercation with Shaq, but he denied using a firearm. (Gov't Ex. BT at ¶ 61 ("I don't even play with guns."); ¶ 79 ("You keep trying to make me say that I shot at somebody and I didn't shoot at nobody.").)

### B. The 2017 Burgess and Felix Recordings

Curtis also testified at trial that he was present during the 2017 shooting. According to Curtis, he heard several gunshots as he was leaving the scene of an altercation but could not see the shooter; after the incident, however, Felix told Curtis that he shot a rival gang member, "T," in Burgess's company. (Trial Tr. 204–07.) In the 2017 Burgess Recording, in response to questioning from law enforcement officers, Burgess denied that he was involved in the shooting because the incident did not fit his modus operandi. (Gov't Ex. CT at ¶ 40 ("Come on man, I sell crack. I got a lawsuit, I had just gotten hit by a car, I got a lawsuit. I'm gonna rob him for his chain? Come on man, that's probably just a story ["T"] made up. That don't make sense.").) Similarly, Felix stated in the 2017 Felix Recording that he was not responsible for the shooting.

3

(Gov't Ex. DT at ¶ 74 ("Um, he probably got me mixed up.  That's what I'm trying to say, I don't know, I don't know any T.").)

### C. The 2018 Robinson Recording

Curtis testified at trial that he had seen members of the conspiracy stashing drugs at an apartment located on Decatur Street in Brooklyn (the "Decatur Stash House"), and on one occasion, he had seen Murphy entering the Decatur Stash House as he was walking out. (Trial Tr. 344–50.) Curtis further testified that he later learned from Burgess that the Decatur Stash House was searched by the police and that Robinson was arrested there. (*Id.* at 354–60.)

In the 2018 Robinson Recording – made after Robinson's arrest, when he was being questioned by law enforcement officers – Robinson initially stated that he and Murphy had only used the back room of the Decatur Stash House for smoking and denied knowing whether the gun found in the front room belonged to Murphy or whether Murphy was involved in any drug dealings at the time. (Gov't Ex. ET at ¶¶ 24, 34, 38.) But later in the recording, Robinson said that the Decatur Stash House was Murphy's "crib" and that the contraband found in the Decatur Stash House – including a loaded pistol, fifty rounds of ammunition, crack, heroin, and marijuana – all belonged to Murphy. (Gov't Ex. ET at ¶ 116 ("I wanna say that's . . . not my crib. That's his crib, feel me?"); ¶¶ 121–22 (Q: Everything that was found in that apartment belongs to Ernest?" A: "Yes.  It's not mine, bro.").)

### D. Grand Jury Proceedings

Before trial, Curtis proffered to the government that Murphy shot someone during an altercation that led to the 2013 Shooting. (Murphy Ex. M at 3–4.) According to Curtis, the altercation was not drug-related, but Murphy asked Larry Bayer, a member of the drug-trafficking conspiracy, to retrieve the gun. (*Id.*) During another proffer session, Curtis reiterated that the

4

2013 Shooting involved a personal dispute between Murphy and a friend and was not related to drugs.  (Murphy Ex. N at 1.)   Curtis also said that he was not sure if Murphy even sold drugs in 2013 and that Murphy was acquitted at trial on charges stemming from the 2013 Shooting.   (*Id.*)

On July 11, 2019, the government appeared before the grand jury to seek the S3 Indictment, which, in addition to the drug-trafficking conspiracy alleged in prior indictments, added a charge against Murphy for possessing and using a firearm in furtherance of drug-trafficking offenses.   In its opening statement to the grand jury, the government mentioned that law enforcement officers found a loaded pistol, ammunition, and drugs in the Decatur Stash House.   (Grand Jury Tr. 4–5.)  The government then explained that the loaded pistol and ammunition found were not Murphy's only involvement with firearms in the case, and that, "[f]or example, the cooperating witness described an incident in 2013 where Murphy had asked Larry Bayer . . . to recover a gun . . . near the scene of [the] shooting."   (*Id.* at 7:6–9.)

The government also called Agent Brittany Raffa, who was present during Curtis's proffer sessions, and elicited testimony from her about the 2013 Shooting.   Specifically, Agent Raffa noted that, according to Curtis, Murphy asked Bayer to retrieve the gun after the shooting, that the gun was recovered by the police before Bayer could get to it, and that Murphy's DNA was later found on the gun.   (Murphy Ex. P at 23–25.)   The grand jury, however, was not presented with Curtis's statements that he did not believe the 2013 Shooting was drug-related, that Murphy was not a member of the gang at that time, or that Murphy was acquitted of the charges related to the 2013 Shooting.

After Agent Raffa was dismissed, members of the grand jury asked the prosecutor whether the 2013 Shooting was related to drug trafficking.   (Grand Jury Tr. 36:23–42:15.)   In response, the government told the grand jury that their "recollection will control" (*id.* at 37:3), but the

5

evidence about the 2013 Shooting, "in the context of aiding and abetting liability, . . . would establish probable cause to believe [Murphy] knew, or it was foreseeable to [Murphy], that firearms were used in connection with the drug conspiracy" (*id.* at 38:6–10). The government then reiterated the definition of aiding-and-abetting liability, and upon the grand jury's request, recalled Agent Raffa, who testified as follows:

> Q: Special Agent Raffa, having been recalled, directing your attention to the 2013 firearms incident involving Ernest Murphy, did the cooperating witness say if he knew the underlying incident with respect to the firearm and what Murphy's involvement was?
>
> A: No, I don't believe so.
>
> . . .
>
> Q: So [the cooperating witness's] knowledge of that 2013 incident is based on conversations he had, he, the cooperator, had with Tyshawn Burgess and Larry Ba[yer]?
>
> A: Yes.
>
> Q: And so his understanding was that Murphy had called upon the other members of the conspiracy to get the gun, basically, before law enforcement reached the block?
>
> A: Yes.
>
> Q: And that was the extent of his understanding?
>
> A: Yes.

(*Id.* at 45:14–46:9.)

After deliberations, the grand jury returned the S3 Indictment charging Murphy with both counts sought by the government. (Doc. No. 379.) Nevertheless, as discussed above, the Court precluded most of the evidence related to the 2013 Shooting before trial (Doc. Nos. 414, 435) and the jury still returned guilty verdicts against Murphy on both counts. (Doc. No. 450.)

## II.     DISCUSSION

Murphy makes two principal arguments in his motion.  First, Murphy contends that the government presented misleading information regarding the 2013 Shooting to the grand jury.  Second, he asserts that the government violated its disclosure obligations by failing to produce the Coconspirator Recordings before trial.  The Court discusses each of these two arguments in turn.

### A. Grand Jury Proceedings

Murphy argues that the government secured the S3 Indictment by presenting misleading information to the grand jury.  (*See* Murphy Br. at 37.)  While Murphy acknowledges that "dismissal of an indictment is an extraordinary remedy," he contends that the government's alleged misconduct here renders this "an extraordinary case," justifying such "an extraordinary remedy."  (*Id.* at 38.)

"Although the grand jury normally operates . . . in the courthouse and under judicial auspices, its institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length."  *United States v. Williams*, 504 U.S. 36, 47 (1992).  Because of the grand jury's independence from the judiciary, "it should come as no surprise that [courts] have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure;" consequently, "any power federal courts may have to fashion . . . rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings."  *Id.* at 49–50.  Against this backdrop, the Supreme Court has specifically held that "[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the grand jury] system."  *Id.* at 52.

In situations in which a prosecutor has engaged in misconduct before the grand jury, "dismissal of the indictment is appropriate only if . . . the [misconduct] substantially influenced

7

the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (internal quotation marks omitted). Dismissal of the indictment is especially unwarranted when "[t]he particular claims of impropriety before the grand jury . . . concern the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence[, or] error in explaining the law" – improprieties that could be "cured in the trial before the petit jury." *Lopez v. Riley*, 865 F.2d 30, 33 (2d Cir. 1989). Thus, as a general matter, "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986). In other words, "the petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." *Id.* at 67. In such a case, "the convictions must stand despite the [alleged] violation" in the grand jury. *Id.*

Murphy asserts that the government secured the S3 Indictment by "knowingly presenting the [g]rand [j]ury with misleading information." (Murphy Br. at 35.) Specifically, he argues that the government should have provided limiting instructions to clarify that the 2013 Shooting was not drug-related and that he did not join the narcotics conspiracy until four years after the incident. (*Id.*) The government maintains that it "never elicited – and [Agent] Raffa never testified – that the 2013 Shooting was drug-related or committed *in furtherance of* the conspiracy." (Gov't Br. at 31 (emphasis added).) Instead, the government explains that "it put evidence of the 2013 Shooting before the grand jury for the same purposes for which it sought to admit the

8

evidence at trial[ – ]to prove the existence of the underlying conspiracy and the relationships between its members."  (*Id*. at 23.)

In its motion in limine before trial, the government argued that evidence regarding the 2013 Shooting was admissible under *United States v. Carboni*, in which the Second Circuit held that evidence of an uncharged crime – such as evidence of the 2013 Shooting – was admissible as direct proof of the charged offense, rather than as evidence of "other crimes" under Rule 404(b), if it (1) "arose out of the same transaction or series of transactions as the charged offense," (2) was "inextricably intertwined with the evidence regarding the charged offense," or (3) was "necessary to complete the story of the crime on trial."  204 F.3d 39, 44 (2d Cir. 2000).  (*See* Doc. No. 377 at 12.)  Relying on *Carboni*, the government argued in its motion in limine that evidence of the 2013 Shooting was admissible as direct evidence of "the narcotics conspiracy" because it tended to "prove[] [Murphy's] connection to one of the conspiracy's central members" – Larry Bayer. (Doc. No. 377 at 16.)  Alternatively, the government relied on Rule 404(b), which provides that "[e]vidence of any other crime, wrong, or act . . . may be admissible" for purposes other than "to prove a person's character," such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  According to the government, evidence of the 2013 Shooting was admissible for several permissible purposes under Rule 404(b), including to "prove the existence of the conspiracy, the role of [Murphy] in that conspiracy, and the conspirators' access to firearms generally."  (Gov't Br. at 2; *see also* Aug. 2, 2019 Tr. 31:17–19.)

As discussed above, the Court rejected the government's theory of admissibility and excluded most of the evidence related to the 2013 Shooting from trial, noting that the government's theory was "nuanced," that the proffered evidence was unduly "prejudicial," and that permitting

9

extensive witness testimony concerning the 2013 Shooting would likely "confuse the jury." (Aug. 2, 2019 Tr. 22:19, 30:12–16; *see also* Doc. No. 414.) But the fact that the Court ultimately rejected the government's theory of admissibility does not suggest – as Murphy contends – that the government must have "knowingly misled both the [g]rand [j]ury" and "the Court" when it presented evidence of the 2013 Shooting before the grand jury and sought to introduce such evidence at trial. (Murphy Br. at 1; Reply Br. at 4.) Indeed, the Second Circuit has long held that there is "a presumption that prosecutors act properly in furtherance of their duties," and allegations of "prosecutorial misconduct" must be supported by "competent evidence." *Doe v. Menefee*, 391 F.3d 147, 172 (2d Cir. 2004) (citing *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995)). Notwithstanding defense counsel's heated rhetoric – accusing the government of "creating a fictional justification for its presentation of evidence" and "attempt[ing] to rewrite (and arguably correct) history" (Reply Br. at 2, 4) – Murphy has not identified any "competent evidence" of prosecutorial misconduct, *Menefee*, 391 F.3d at 172. To the contrary, the record shows that the government has maintained the same theory of admissibility before trial, on appeal, and now in opposition to Murphy's post-trial motion. (*See* Doc. Nos. 377, 894, 926.) And though the Court ultimately found the government's theory of admissibility to be flawed and its presentation before the grand jury to be somewhat confusing, there is nothing in the record to suggest that the government "knowingly misled [either] the [g]rand [j]ury" or "the Court." (Murphy Br. at 1; Reply Br. at 4.)

In any event, even if it could be argued that the government's grand-jury statements were misleading, any error was harmless and ultimately beside the point. The Supreme Court has made clear that "[i]mposing upon the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the grand-jury] system." *Williams*, 504 U.S. at 52.

Murphy has not articulated any reason for the Court to deviate from the Supreme Court's guidance and impose on the government a heightened standard of disclosure in grand-jury proceedings. And to the extent that the government's failure to provide limiting instructions before the grand jury could be considered prosecutorial misconduct, "the petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." *Mechanik*, 475 U.S. at 67.

In this case, the Court excluded most of the evidence of the 2013 Shooting from trial, including ballistics evidence, DNA evidence, and the firearm itself. (Doc. No. 414.) And insofar as the 2013 Shooting was referenced in witness testimony during trial, the Court provided limiting instructions to clarify that the incident was "not an act charged in this conspiracy" and it was only "being offered for background and context to explain the conversation that" the witness was describing. (Trial Tr. 370:25–371:9.) The jury nonetheless found that Murphy committed the charged offenses beyond a reasonable doubt – a conclusion that the Second Circuit has already affirmed on appeal. (Doc. No. 894.) In light of the Supreme Court's guidance, the trial record, the jury's guilty verdicts, and the Second Circuit's affirmance on direct appeal, the Court cannot agree with Murphy that the government's alleged misconduct in grand-jury proceedings renders this case "an extraordinary case" justifying the "extraordinary remedy" of dismissing the indictment. (Murphy Br. at 38.)

11

B. **Coconspirator Recordings**

Murphy next argues that the Coconspirator Recordings were material, non-cumulative exculpatory evidence under *Brady*, and that the government's failure to timely disclose them before trial warrants a new trial under Rule 33.[1]  (*See* Murphy Br. at 25.)

Rule 33 provides that, "[on] the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Because "trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses," a district court "may intrude upon the jury function" only under "exceptional circumstances."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).  Therefore, before a district court may grant a Rule 33 motion, the defendant bears the burden of showing that there is "a real concern that an innocent person may have been convicted" and that "letting [the] guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

"It is well-established by *Brady* and related authorities that in a criminal prosecution, the government has an affirmative duty under the Due Process Clause to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense."  *United States v. Hunter*, 32 F.4th 22, 30 (2d Cir. 2022) (internal quotation marks omitted).  "That said, not all instances of governmental nondisclosure violate *Brady*."  *Id.*  Rather, the *Brady* doctrine

---

[1] Murphy also seeks dismissal of the indictment based on the government's alleged "disclosure failures" under *Brady*. (Murphy Br. at 34.)  But the Second Circuit has made clear that "[e]ven if [a defendant] had established a *Brady* violation, dismissal of the indictment would not have been an appropriate remedy."  *United States v. Halloran*, 821 F.3d 321, 342 n.14 (2d Cir. 2016); *see also Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc) ("[T]he remedy for a *Brady* violation is vacatur of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to [him]."). Dismissal of the indictment, on the other hand, "is an extreme sanction and a drastic remedy appropriate only when it is otherwise impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, or when there is a widespread or continuous pattern of prosecutorial misconduct."  *Halloran*, 821 F.3d at 342 n.14 (citations and internal quotation marks omitted). Neither of those conditions is satisfied here.

extends only to evidence that is "(1) favorable, (2) suppressed, and (3) prejudicial." *Id.* at 31. Moreover, for the withheld evidence to be prejudicial, it must be "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Evidence is "material" only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stillwell*, 986 F.3d 196, 200 (2d Cir. 2021). Undisclosed impeachment evidence concerning a government witness may be material "where the witness in question supplied the only evidence linking the defendant to the crime." *United States v. Avellino*, 136 F.3d 249, 256 (2d Cir. 1998). By contrast, "where ample ammunition exists to attack a witness's credibility, evidence that would provide an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." *United States v. Orena*, 145 F.3d 551, 559 (2d Cir. 1998).

Here, even assuming that the government should have disclosed the Coconspirator Recordings in advance of trial, Murphy has failed to demonstrate any prejudice. *See Hunter*, 32 F.4th at 31 ("[Under *Brady*,] a defendant must show that he was prejudiced by the prosecution's failure to disclose."). As a threshold matter, Murphy has not articulated any theory of admissibility by which he could have introduced the Coconspirator Recordings at trial. Murphy did not attempt to call Robinson, Burgess, or Felix to testify as witnesses. Nor has Murphy even suggested that his coconspirators would have been willing to waive their Fifth Amendment privilege against self-incrimination to testify on his behalf. *See United States v. Jackson*, 335 F.3d 170, 177 (2d Cir. 2003) (noting that a witness who invokes the privilege against self-incrimination is "unavailable" within the meaning of Rule 804(b)). Without more, the Coconspirator Recordings would likely constitute inadmissible hearsay, as they comprise out-of-court recordings of out-of-court statements made by declarants who did not testify at trial.

13

*See United States v. Yousef,* 327 F.3d 56, 153 (2d Cir. 2003) (concluding that "a statement would have constituted double hearsay because it is an out-of-court statement assertedly repeating another out-of-court statement for the truth of the matter asserted").

Moreover, the only truly exculpatory material contained in the Coconspirator Recordings was in the 2018 Robinson Recording, in which Robinson initially insisted that he and Murphy had only used the back room of the Decatur Stash House for smoking and denied knowing whether the gun found in the front room belonged to Murphy or whether Murphy was involved in any drug dealings at the time. (Gov't Ex. ET at ¶¶ 24, 34, 38.) But as noted above, later in the recording, Robinson changed his story and stated that the Decatur Stash House was Murphy's "crib" and that the contraband found in the Decatur Stash House – including a loaded pistol, fifty rounds of ammunition, crack, heroin, and marijuana – all belonged to Murphy. (*Id.* at ¶ 116.) It is therefore hard to imagine that Murphy's counsel would have called Robinson to the stand and run the risk that Robinson would further inculpate – rather than exculpate – Murphy.

The remaining Coconspirator Recordings did not exculpate Murphy at all; they merely provided impeachment material by contradicting aspects of Curtis's trial testimony relating to coconspirators other than Murphy. But to the extent that Murphy could have utilized the Coconspirator Recordings to impeach Curtis at trial, the recordings clearly would have been "cumulative" and thus "not material." *Avellino*, 136 F.3d at 257. On cross examination, Curtis admitted that he cooperated in exchange for the government's 5K letter, which might permit the Court to reduce his 20-year mandatory minimum sentence to time served. (Trial Tr. 386–97.) He also admitted that he had committed numerous petty larcenies throughout his lengthy criminal career (*id.* at 398–99); that he defrauded a bank by depositing a fake check in his account (*id.* at 399–401); that he was involved in multiple drug dealings and shootings as part of his

membership in two narcotic gangs (*id.* at 401, 416–17); that he attempted to smuggle contraband into correctional facilities on more than one occasion (*id.* at 401–12); that he assaulted his wife several times (*id.* at 412–13); that he hid a firearm at his mother's house, where his 15- and 7-year-old siblings lived (*id.* at 418–19); and that he breached the oath he took upon joining a gang that he would not testify against other members of the same gang (*id.* at 451–52). This extensive record suggests that "ample ammunition exist[ed] to attack [Curtis]'s credibility," *Orena*, 145 F.3d at 559, and the Coconspirator Recordings would "merely furnish[] an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995).[2]

In addition to the cumulative nature of the Coconspirator Recordings as impeachment material, the fact remains that the government's evidence at trial was nothing short of overwhelming and thoroughly corroborated Curtis's testimony. For instance, the government presented numerous wiretap calls in which the coconspirators – including Murphy – discussed their drug dealings and the use of firearms to protect their drug supplies. (*See, e.g.*, GX 304T, 462T, 463T, 466T–471T, 477T, 483T, 496T, 500T, 501T.) The government also introduced the fruits of numerous searches, including (1) the ammunition, drugs, baggies, digital scale, and over $4,000 in cash seized from Murphy's apartment at the time of his arrest (Trial Tr. 88–110); and (2) a loaded handgun, drugs, and more than $3,000 in cash seized from the Decatur Stash House, which were located next to Western Union receipts and insurance documents bearing Murphy's

---

[2] The impeachment value of the Coconspirator Recordings is diminished further by the fact that Robinson, Burgess, and Felix all subsequently acknowledged their involvement in the shootings in question. During his change-of-plea hearing, Robinson allocuted that he committed the 2015 shooting in connection with his drug-trafficking activities. (*See* Apr. 17, 2019 Tr. 51–53 ("On July 30, 2015[,] I fired a gun in relation to selling drugs with others.").) Similarly, at sentencing, Burgess and Felix both admitted that they participated in the 2017 shooting in an attempt to rob "T". (*See* Burgess PSR ¶¶ 34, 72; Felix PSR ¶ 67; June 25, 2021 Tr. at 41:5–11 (Burgess admitting to the participation in the 2017 shooting at sentencing); Doc. No. 510 (Felix withdrawing "any objection" concerning the PSR's description of his participation in the 2017 shooting).)

name and personal information (*id.* at 668–84). Based on this overwhelming evidence, the jury convicted Murphy on both counts of the S3 Indictment, and the Second Circuit rejected Murphy's sufficiency challenge on direct appeal. Accordingly, the Court cannot conclude on this record that "had the [recordings] been disclosed to [Murphy before trial], the result of the proceeding would have been different." *Stillwell*, 986 F.3d at 200.

### III. CONCLUSION

Notwithstanding defense counsel's incendiary assertions of government misconduct, Murphy has failed to demonstrate that the government secured the S3 Indictment by presenting misleading information to the grand jury or that the government's failure to timely disclose the Coconspirator Recordings before trial constituted a *Brady* violation. Accordingly, Murphy's motion for dismissal of the indictment and/or a new trial is DENIED. The Clerk of Court is respectfully directed to terminate the motion at Docket No. 909.

SO ORDERED.

Dated:   April 26, 2023
         New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation